## No. 2900.

### B. M. Horrell & Co. v. H. N. Parish—Louisiana National Bank, Intervenor.

A broker who acted for both parties in a transaction, and his son, who attended to the business at his office, were both competent to testify with regard to what passed between said parties, and to prove certain conversations and statements, to which a bill of exceptions was taken, on the ground that they were made out of the presence and hearing of the parties objecting thereto.

The court does not see why a man should not be allowed to testify in a civil matter, because his testimony may show that he has been guilty of an offense against the laws of the State. This is an objection which he alone could make.

When cotton is on board of a ship and under bills of lading when seized, it must be considered as under the control of the master of the ship, and the master holds it subject to the owners of the bills of lading—who are the intervenors in this case.

There is no validity in the allegation that the title of defendants is not complete, because the bill of lading is not perfect, inasmuch as when the bill calls for cotton "as marked in the margin," there are no such marks. There was nothing suspicious in the transaction, and the intervenors may be considered as sufficiently prudent when they treated on the pledge of the bill of lading.

A bill of lading is, after all, only the evidence of a contract to deliver property at a certain point, and it is not the marks on the margin therein, or on the property shipped, which give life to the obligation. The marks are given only for the convenience of identification. But in this case there is no question of identity.

Another fatal bar to plaintiffs' right to recover, is the want of registry of their privilege, if they were entitled to one. The law grants a privilege for five days. The sale was recorded eight days after it was made, and two days after this suit was instituted. Therefore, plaintiffs had lost their privilege as to the intervenors.

APPEAL from the Fourth District Court, parish of Orleans. *Théard,* J. *J. A. Rozier,* for plaintiffs and appellees. *Randolph, Singleton & Browne,* for defendant and appellant. *Lea, Finney & Miller,* for intervenor and appellant.

Morgan, J. On the fourth February, 1870, Horrell & Co., through

J. J. Browne, a broker, sold to Wilbur & Co., one hundred and twenty-seven bales of cotton. At the time of the sale, the cotton was stored in one of the presses of this city, and Horrell & Co. gave to Browne, the broker, an order on the press for the same. On the same day, Wilbur & Co. engaged room for one hundred and fifty bales cotton on the Weybossett, a steamer plying between this port and New York, for which Fosdick & Co. were the agents.

On the same day, Wilbur & Co. handed to Fosdick & Co. bills of lading for one hundred bales. Before signing the bills of lading, a member of the house of Fosdick & Co. called on Wilbur & Co.'s broker, who told him that he had purchased one hundred and twenty-seven bales for them, which he would receive and ship on that day, or the day after. Fosdick & Co. then signed the bills of lading for one hundred bales. The bills were signed at the countinghouse of Fosdick & Co. It is the custom, at this port, to sign bills of lading for property shipped on ocean steamers, at the office of their agents. There was some delay in sending the cotton to the ship, a member of the house of Fosdick & Co. declaring that from day to day he called upon the son of the broker through whom the sale was made, and who attended to the details of his father's business, and he was daily promised that the cotton would be sent. It was finally sent, and it was all on board the steamer, and stowed away on the ninth February; and was sent to the steamer under an order from Wilbur & Co.

On the fifth February, 1870, Wilbur & Co. drew their bill of exchange at ten days sight on Messrs. Williams, Black & Co. of New York, for $9500. Attached to the bill of exchange was the bill of lading, dated the fourth February, signed by Fosdick & Co. for one hundred bales cotton. The bill was purchased by the Louisiana National Bank.

On the ninth February, 1870, Wilbur & Co. drew another bill of exchange on the same parties, at the same date, for $4000. Attached to this bill of exchange was also another bill of lading signed by Fosdick & Co., agents of the Weybossett, for forty-five bales cotton. This bill was also purchased by the Louisiana National Bank. Both of these bills were sold to the bank in the ordinary course, and were purchased by the bank, according to the testimony of its President, on the security of the bills of lading which were attached to them.

On the tenth February, and after all the above described cotton was stored on the Weybossett, plaintiffs instituted this suit, and seized the same, alleging that the price therefor, $13,379 28, had not been paid, and upon which they claim the vendor's privilege. Their privilege was recorded on the twelfth February.

Parish, the master of the Weybossett, answers and claims in recon-

vention $323 63 for freight and charges on the cotton. The Louisiana National Bank intervenes and claims it under their bills of lading—the drafts to which they were attached not having been paid. The contest in reality is between Horrell & Co. and the bank; the one, as above stated, claiming the right to enforce the vendor's privilege upon the cotton; the other claiming it under their bills of lading. There was judgment in the district court for the plaintiffs. The defendant and the bank have appealed.

A bill of exceptions was taken on the trial to the ruling of the court permitting Rareshide to prove that J. J. & J. M. Browne made certain statements to him relative to the shipping of the one hundred and twenty-five bales cotton; and also to his being allowed to detail certain conversations held with them out of the presence of Horrell & Co. relative to the purchase of the cotton in question by Wilbur & Co. and the shipment of the same by Wilbur & Co., and other conversations and statements, on the ground that they were made and took place out of their presence or hearing, and that the said J. J. & J. M. Browne had no authority to bind them. They also objected to the ruling of the court which allowed the intervenors to establish by the same witnesses the circumstances attending the signing of the bills of lading by Fosdick & Co. before the cotton had been delivered to the ship, or put under her control, on the ground that the laws of the State make it a criminal offense for any master or agent of a ship to sign bills of lading before the delivery of the property to be shipped, and that no person guilty of such an offense can be permitted to testify thereto.

Browne was the broker who acted for both parties, and his son attended to the business of his office. They were both competent to testify with regard to the transactions between the parties. The objection went to their credibility and not to the admissibility of their evidence.

We do not see why a man should not be allowed to testify in a civil matter because his testimony may show that he had been guilty of an offense against the laws of the State. In our opinion this was an objection which he alone could make.

It is unquestionable that the cotton which forms the basis of this controversy was sold by Horrell & Co. to Wilbur & Co. on the fourth February. The sale was made through their common broker, to whom Horrell & Co. gave an order to the press where it was stored for the delivery of the same. Their title to the cotton passed from them when they gave the order for the same. The broker held for Wilbur & Co. It was theirs to dispose of. It could have been shipped by them through the broker at any time. The broker was repeatedly called

upon by the agents of the steamer to send it down to the vessel, and the broker as repeatedly promised to do so; the reason he gives for not having done so being that the weather was inclement, and it was finally shipped under that order. It is distinctly proved that the cotton was on the Weybossett, under the bills of lading when it was seized. It was then under the control of the master of the ship, and the master held it subject to the owners of the bills of lading. See the case of the Thames, 14 Wallace, pp. 98–106, and the cases there referred to.

Under this state of facts we think the case is covered, in principle, by the case of Delgado & Co. v. Wilbur & Co., lately decided. 25 An. 82. It differs from Delgado's case in this, that whereas, in the Delgado case, the seizure was made the day following the sale; in this case, it was not made for six days after.

It has been suggested that it would be inconvenient and hazardous for cotton buyers to be compelled to withdraw their funds from the banks and to pay for cotton which they purchase as the bales pass the scales and are delivered. We do not say that this process is necessary, nor do we see why it should be. At all events, the "inconvenient" argument has no law to support it. If it could be listened to at all, it might, we think, be applied with peculiar force in favor of these intervenors, and those who are pursuing the same business, against the plaintiffs. As we have before seen, Horrell & Co. sold to Wilbur & Co. one hundred and twenty-five bales cotton on the fourth February. The terms of sale were cash. On the same day Horrell & Co. gave to their common broker an order for the cotton, and on this order it was delivered to Wilbur & Co. The intervenors, on the faith of the bills of lading, advanced the value of the cotton to their holder, and the bills were transferred to him. On the tenth of February, six days after the sale, and after the cotton was on shipboard, the cotton was seized, because the price for which it was sold had not been paid. No requirement seems to have been made for the payment of the money from Wilbur & Co. when this cash sale was made, prior to delivery, no demand was made on them for it, or for any part of it; no tender was ever made of any sum in payment therefor until the ninth. On that day, Wilbur & Co. gave their check for $8000—not $13,379, the price of the cotton; this check was not certified by the bank upon which it was drawn; it was not presented for payment until the following day, about ten o'clock in the morning; there is no evidence in the record to show that if it had been presented on the day it was drawn it would not have been paid. It is established that it was not paid on the following day, because Wilbur & Co. had no funds in the bank upon which the check was drawn, and that their account was already overdrawn. But it does not appear when it was overdrawn,

and it is neither impossible nor improbable that it was overdrawn on the morning after and not on the day before the check was presented. At all events, these are matters of fact which were under the control of the plaintiffs, and about which there is nothing in the record. They sold for cash, and delivered their property without having received any cash; days elapsed after the sale, and they made no demand for the price; a check for part of the price was sent to them, which they accepted; the check was not even certified to be good by the bank upon which it was drawn, and it was not presented for payment until the day after its date. In the meanwhile the intervenors had paid their money upon bills of lading which represented that the property was in the possession of the purchaser. Under these circumstances, who can say that Horrell & Co., if they suffer, do not suffer from their own negligence? And who can say that if the intervenors suffer, it will not be because of Horrell & Co.'s negligence? To decide the case in favor of Horrell & Co. would be to hamper operations in commerce with almost prohibitory inconveniences. When a bill of exchange, drawn on a bill of lading, is presented to a bank, or dealer in exchange, the bank or dealer would have, first to send to the vessel on which the property is said to have been shipped, and find out whether or not it was aboard; second, satisfied in this regard, he would then have to find out whether the property had really been delivered to the shipper; third, satisfied here, he would have to find out who sold the property; and, if it were cotton, and a large lot, and had been bought from various parties, the vendors would all have to be brought up, and it would have to be ascertained whether, in reality, they had made the sales imputed to them; fourth, this ascertained, he would have to find out whether the property sold had been paid for, and if not paid for when the sale was made, when possession was acquired, in order to determine when the vendor's privilege attached and ended, and then search the recorder's office to discover whether the privileges of the vendor had been recorded. How many transactions in exchange could be accomplished in a day if the sale of every bill involved the necessity of so much investigation? And all this, why? Because it is inconvenient for a purchaser to draw his money from the bank in which it is deposited, and pay for the property which he buys for cash, when it is sold to him. But the money has to be drawn from the bank by some one. Why should it not be done by the buyer as well as by the seller. In this way the transaction is easy and complete. No one is inconvenienced even, and no one is harmed; not the purchaser, for he has paid his money; not the vendor, for his property has been paid for; not the buyer of the bill drawn upon the property and attached to a bill of lading therefor, for the property is represented by the bill,

and is free to go forward to its destination. To give this case to the plaintiff, is to place dealers in exchange at the mercy of every speculator who has the appearance of thrift, and the capacity to purchase apparently for cash, while in reality he is purchasing on credit.

It has been contended that the title to the bank is not complete, because the bill of lading is not perfect. The alleged deficiency is that while the bill calls for cotton "as marked in the margin," there are no marks in the margin. They rely principally upon the testimony of W. S. Pike and Alex. Brother to establish the fact that if the marks are not inserted in the bill of lading, it is out of the usual course of business. These witnesses do say so. But they say further: "If the bills of lading came through a respectable channel, I should not consider the omissions of the marks as more than a clerical error, though not in the usual course, if everything else seemed fair. I should not on account of the omission of the marks, decline the bills, especially if one of the bills of lading was marked." Now, there was nothing suspicious about the transaction connected with these bills. They were negotiated through a broker against whose standing nothing has been alleged; they were purchased in the usual manner and for a valuable consideration; they were drawn by a house in good reputation and credit, the best evidence of which is that plaintiffs allowed days to elapse without making a demand for the price of the property which they had sold them for cash. Indeed they never made a demand for the price of the sale. Days after it was made, they received a check as cash in part payment of the price, and the probability is that if the check had been paid on presentation, the cotton would have been at sea before any demand would have been made. If Horrell & Co. considered it safe to deal with Wilbur & Co. without exacting any security whatever, the Louisiana National Bank may be considered as having been sufficiently prudent when they treated with them on the pledge of a bill of lading. Besides, a bill of lading is, after all, only the evidence of a contract to deliver property at a certain point; and it is not the marks on the margin thereon, or on the property shipped, which gives life to the obligation. The marks are given merely for the convenience of identification. It could not be seriously contended that, if I ship one hundred bales of cotton on a vessel, the bales not being marked, or, if marked, the marks not being mentioned in the bill of lading, the vessel on arriving at her port of destination could not be compelled to deliver my cotton, simply because the marks were not described in the margin of a bill of lading. Everything shipped on a vessel is covered by a bill of lading; and if everything so shipped had to be marked, and the marks had to be noted in the margin of the bill of lading, in order to entitle the party who shipped it, or to whom it

was shipped, to obtain possession of it when it reached its destination, how would it be with reference to a cargo of coal or a cargo of salt? But there is no question of identity here. No one pretends that the cotton seized is not the cotton sold by Horrell & Co. to Wilbur & Co.; that it is not the cotton shipped on the Weybossett, or that it is not the cotton which is represented in the bills of lading upon the faith of which the bank purchased Wilbur & Co.'s bill of exchange.

Another fatal bar to plaintiffs' right to recover, is the want of registry of their privilege, if they were entitled to one. The law grants a privilege for five days. The sale was made on the fourth of February; it was not recorded until the twelfth, eight days after the sale, and two days after this suit was instituted. Counsel admit, that, upon this point, the decisions of this court are in favor of the intervenors, "in cases of ordinary privileges;" but he contends that these decisions should not govern this case. The cases in which the decisions he refers to occurred were carefully considered, and the result arrived at after deliberate consideration and reflection. We then believed them to be a correct application of the law, and our minds now are the same that they were then.

It is urged that the interpretation we placed on the law is contrary to the custom and to the understanding of the bench and the bar for a long series of years. So far as we know of the opinions of the bench they are the other way. So far as the bar is concerned, their approbation of the correctness of our decisions is of consequence to us, although we should be obliged to decide against them, although they might be unanimous in their opinion against us. Custom, too, is to be considered, and we would be loth to disturb any practice which had become almost a part of the law itself. But inasmuch as the constitution under which privileges are required to be recorded in 1870, assuming the custom to be as they stated, we do not think it is so protected by the crust of antiquity as to make our breaking it a judicial sacrilege. But, in our opinion, the law has only been followed in the decisions complained of, and although no mere custom could have possibly affected the decision in those cases, no custom has been shown to have been changed by them.

In a pecuniary point of view the matter in dispute here is comparatively small, but the importance of the questions involved is of great moment to this essentially commercial community. It is for this reason that we have considered them so much in detail. The prosperity of a people depends upon their commerce, their agriculture or their manufactures. It is when they combine the three that they become powerful, and it is the excellence achieved in all these sources of wealth which has made this nation great amongst the greatest of the

earth. Particularly are we of this city dependent upon commerce. It would be suicidal to hamper its transactions with onerous and useless requirements, and to throw obstacles in the way of its free pursuit. The prosperity of a people who, like ourselves, live by the sea, is commerce. Its actions should be as free as a due regard for the rights of the citizen will permit; as untrammeled, in so far as is possible, as are the waters upon which it floats, and as unconstrained as are the winds which drive it from shore to shore.

It is therefore ordered, adjudged and decreed that the judgment of the district court be avoided, annulled and reversed, and that there be judgment in favor of the Louisiana National Bank decreeing said bank to be entitled under their bill of lading to the one hundred and twenty-three bales of cotton in contest herein, and that they be put in possession of the same. The costs to be paid by appellees.

---

LUDELING, C. J. The plaintiffs claim a privilege to secure the price of the cotton sold by them. They did not record their privilege until after the institution of this suit. They, therefore, had lost their privilege when this suit was instituted, as to the intervenors.

Whether the sale was perfected when it was completed, it is unimportant to determine, for the plaintiffs allege a sale and claim a privilege to secure the price thereof. They are concluded by their judicial admissions.

I therefore think that the plaintiffs' demand should be rejected with costs.

---

HOWELL, J. I concur in the opinion of the Chief Justice.

---

WILY, J. I dissent both as to the proof of the facts and the law of this case.

Rehearing refused.